Jane DOE, a minor, By and Through her guardian and mother, Alisa RUDY–GLANZER, Plaintiff–Appellant,

v.

Elroy "Bud" GLANZER, an individual, Defendant–Appellee.

No. 98–36213.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 9, 2000.

Filed Nov. 17, 2000.

Lawrence G. Sirhall, Jr., Boise, Idaho, for the plaintiff-appellant.

Michael D. Gaffney, Idaho Falls, Idaho, for the defendant-appellee.

Before: W. FLETCHER, HALL, and TASHIMA, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Jane Doe ("Doe"), a minor, appeals through her guardian and mother, Alisa Rudy–Glanzer ("Rudy–Glanzer"), the denial of a motion for a new trial. The trial by Rudy–Glanzer against Doe's paternal

grandfather Elroy Glanzer ("Elroy"), resulted in a verdict in Elroy's favor. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## I

This case is a personal injury action by Rudy–Glanzer, acting on behalf of her minor daughter Doe, against Doe's paternal grandfather Elroy. The complaint alleges that Elroy physically and sexually molested Doe when the latter was approximately three or four years old.

Rudy–Glanzer's allegations are as follows: In November 1995, about one week after Doe had stayed at Elroy's home, she revealed to her mother that Elroy had stuck a gun to Doe's stomach and threatened her if she disclosed "his secret." Following that conversation Barry Glanzer ("Barry"), who is Elroy's son and was Rudy–Glanzer's husband at the time, confronted Elroy regarding what Doe had said. Elroy explained that Doe must have seen the gun on a closet shelf in his bedroom because it would be readily visible even by someone Doe's size.

Following the confrontation, Doe was referred to a therapist, Michelle Pharris–Klar ("Pharris–Klar"). While playing with some dolls, Doe allegedly mimicked the acts that Elroy performed on her, which included the spreading of Doe's legs and the touching of her vagina. Doe also claimed that Elroy enticed her into touching his penis. Pharris–Klar informed an investigator for the Idaho Health and Welfare department of Doe's allegations. Doe allegedly repeated her story to an investigator, but the recorder which was taping Doe's account malfunctioned and this evidence was lost. No criminal charges were filed against Elroy, but at the time the civil lawsuit commenced, the criminal investigation remained open.

Rudy–Glanzer brought this civil personal injury lawsuit against Elroy, seeking damages for willfully and lewdly committing one or more acts of lewd and lascivious conduct upon Doe. *See* Idaho Code § 6–1701 (Michie 1998). Rudy–Glanzer also asserted causes of action for assault and battery, as well as a claim for punitive damages.

During his deposition, Rudy–Glanzer's counsel asked Elroy whether he had submitted to a penile plethysmograph. A penile plethysmograph is a test that measures, through electric wires attached to a man's penis, the reactions that a man has when presented with certain visual stimuli, in this case pictures of naked girls. Elroy's counsel asserted Elroy's Fifth Amendment privilege against self-incrimination and instructed Elroy to refuse to answer that question. Rudy–Glanzer then tried to use Elroy's invocation of his privilege against self-incrimination to draw an inference adverse to Elroy, but the district court, in an order pertaining to the parties' various motions in limine, refused to let Rudy–Glanzer do this.

Also before trial, Rudy–Glanzer filed a disclosure statement pursuant to Federal Rule of Evidence 415 in which she stated that she planned to introduce evidence of prior sexual misconduct allegedly perpetrated by Elroy many years earlier on another young girl. Rudy–Glanzer made an offer of proof regarding this evidence, but the district court refused to allow the evidence in. During trial, which lasted from August 17 until August 21, 1998, Elroy's counsel allegedly tried to imply that Rudy–Glanzer's case: (1) was based on her wish to exact revenge on the Glanzer family for her failed marriage to Barry; and (2) stemmed from Rudy–Glanzer's alleged molestation by her own father many years earlier. Rudy–Glanzer's counsel objected to this implication several times throughout the trial, and the district court routinely sustained such objections, instructing Elroy's counsel that such inquiries had to cease immediately.

After the jury rendered a verdict in Elroy's favor, Rudy–Glanzer moved for a new trial. Her motion was based upon three alleged fatal flaws with the process: (1) that the district court improperly denied Rudy–Glanzer the ability to present

Elroy's invocation of his privilege against self-incrimination at trial, thus preventing the jury from drawing an adverse inference therefrom; (2) that the district court's decision not to allow evidence of Elroy's prior sexual misconduct was erroneous; and (3) that Elroy's counsel's references to inadmissible topics such as Rudy–Glanzer's divorce, and her alleged prior molestation, infected the jury's perception and prejudiced the outcome. The district court denied this motion and Rudy–Glanzer appeals.

## II

■■■ We review a district court's ruling on a motion for a new trial for an abuse of discretion. *See United States v. 4.0 Acres of Land,* 175 F.3d 1133, 1139 (9th Cir.1999). We apply that same standard of review to evidentiary rulings by the district court. *See Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir. 1999).

### A. *Privilege Against Self–Incrimination*

Rudy–Glanzer argues that the district court should have allowed a negative inference from Elroy's invocation of his Fifth Amendment privilege against self-incrimination to reach the jury when, at his deposition, Elroy refused to answer a question regarding whether he had ever submitted to a penile plethysmograph.

### 1. INVOCATION OF THE PRIVILEGE

■■■ The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." Notwithstanding the text that seemingly limits the right against self-incrimination to the criminal context, the Fifth Amendment's protections have been deemed to apply to civil proceedings. *See Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). Thus, the Fifth Amendment's protections against self-incrimination can be asserted in any proceeding, be it civil, criminal, administrative, judicial, investigative or adjudicatory. *See Kastigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). However, in the civil context, the invocation of the privilege is limited to those circumstances in which the person invoking the privilege reasonably believes that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner. *See United States v. Bodwell,* 66 F.3d 1000, 1001 (9th Cir.1995). Therefore, the "privilege against self-incrimination does not depend upon the *likelihood,* but upon the *possibility* of prosecution" and also covers those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence. *See United States Liquor Co. v. Gard (In re Seper),* 705 F.2d 1499, 1501 (9th Cir.1983). The only way the privilege can be asserted is on a question-by-question basis, and thus as to each question asked, the party has to decide whether or not to raise his Fifth Amendment right. *See Bodwell,* 66 F.3d at 1001.

■■■ As a preliminary matter, Elroy's counsel argues that Elroy never invoked his privilege against self-incrimination when asked whether he had ever submitted to a penile plethysmograph. This contention is squarely refuted by the transcript of Elroy's deposition. Rudy–Glanzer's counsel asked explicitly, "[d]id you ever take such a test [i.e., a penile plethysmograph]?" Deposition Transcript at 44. Elroy's counsel objected saying this is an unfair question, and when Rudy–Glanzer's counsel asked Elroy's counsel to state the grounds of the objection, Elroy's counsel replied that Elroy should not answer because it would violate his client's "fundamental due process" rights and that Elroy was entitled to raise "a Fifth Amendment objection" to Rudy–Glanzer's line of questioning. *Id.* at 44–45. Elroy never answered the question. Elroy's counsel's statement pertaining to his client's Fifth Amendment right not to respond to the question regarding the penile plethysmography is a clear indication that

the privilege against self-incrimination was successfully invoked in this deposition.

## 2. ADVERSE INFERENCES FROM THE INVOCATION OF THE PRIVILEGE

■ "It is well established that in a criminal trial a judge or prosecutor may not suggest that the jury draw an adverse inference from a defendant's failure to testify." *United States v. Solano–Godines,* 120 F.3d 957, 962 (9th Cir.1997). However, in civil proceedings adverse inferences can be drawn from a party's invocation of this Fifth Amendment right. *See SEC v. Colello,* 139 F.3d 674, 677 (9th Cir.1998).

The seminal case in this area is *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). In *Baxter,* the Supreme Court was confronted with a prison inmate who had been brought before a prison disciplinary board on charges of inciting a disturbance. When informed that state criminal charges might be brought against him arising out of his conduct while in prison, the inmate was advised that he could remain silent before the board, but that his silence would be used against him. *See id.* at 312, 96 S.Ct. 1551. During the hearing, the inmate was confronted with incriminating evidence, remained completely silent, and as a consequence was given further punishment under the assumption that he perpetrated the acts for which he was being questioned. *See id.* at 313, 317, 96 S.Ct. 1551. The Supreme Court held that the drawing of the adverse inference from the inmate's silence was proper when incriminating evidence had also been presented, and therefore no Fifth Amendment violation had taken place. *See id.* at 317–18, 96 S.Ct. 1551.

■ The *Baxter* holding is not a blanket rule that allows adverse inferences to be drawn from invocations of the privilege against self-incrimination under all circumstances in the civil context. Rather, lower courts interpreting *Baxter* have been uniform in suggesting that the key to the

*Baxter* holding is that such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer. *See, e.g., LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 391 (7th Cir.1995); *Peiffer v. Lebanon Sch. Dist.,* 848 F.2d 44, 46 (3d Cir.1988). Thus, an adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in a complaint. *See Nat'l Acceptance Co. v. Bathalter,* 705 F.2d 924, 930 (7th Cir.1983). In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted. *See LaSalle Bank,* 54 F.3d at 391.

■ The tension between when to allow the adverse inference, and when not to allow it, stems from the consideration that because, in a civil proceeding, "the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding." *Serafino v. Hasbro, Inc.,* 82 F.3d 515, 518 (1st Cir.1996). Thus, not allowing the negative inference to be drawn "poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth." *SEC v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir.1994); *see also id.* at 191 (noting that "a party's invocation of the privilege may be proper, but it does not take place in a vacuum: the rights of the other litigant are entitled to consideration as well.").

However, the Supreme Court has made it clear that certain sanctions stemming from a party's refusal to answer a question on Fifth Amendment grounds are too costly. For example, a state statute that forces an officer of a political party to waive his Fifth Amendment right or forfeit

his office is unconstitutional. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 807–09, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). Similarly, individuals cannot be forced to waive their Fifth Amendment rights against self-incrimination by threats that their employment will be terminated. *See Turley*, 414 U.S. at 83–85, 94 S.Ct. 316. Moreover, the Rules of *Civil* Procedure recognize an appropriate role for the exercise of this privilege, and a refusal to respond to discovery under such invocation cannot justify the imposition of penalties. *See* Fed.R.Civ.P. 26(b)(5); *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 (5th Cir.1979). Also along these lines is a decision in which a court found that no negative inference could be drawn from a party's assertion of the attorney-client privilege. *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir.1999). The *Nabisco* court reasoned that the policy behind the attorney-client privilege was paramount and trumped the questioner's right to acquire information. *See id.* The court noted that those cases in which a negative inference was allowed against a person asserting the privilege stemmed from the recognition that the person refusing to answer the question posed had some affirmative duty to reveal such information. *See id.* (citing *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir. 1994)). Thus, these sources suggest that under certain circumstances, within the civil framework, because of the constitutional nature of the right implicated, an adverse inference from an assertion of one's privilege not to reveal information is too high a price to pay.

■■■ The tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding is resolved by analyzing each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation. *See Graystone Nash, Inc.*, 25 F.3d at 192. This approach allows the courts the flexibility to fashion and develop rules pertaining to the privilege, and leaves the door open to change. *See Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). In each particular circumstance, the competing interests of the party asserting the privilege, and the party against whom the privilege is invoked must be carefully balanced. *See Graystone Nash, Inc.*, 25 F.3d at 192. "Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side." *Id.* In that light, no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information. *See, e.g., Serafino*, 82 F.3d at 518–19.

■■■ In this case, the only specific information being sought by Rudy–Glanzer's counsel was whether Elroy had ever submitted to a penile plethysmograph. This conclusion stems from the fact that in a civil case, the Fifth Amendment's protections against self-incrimination are invoked on a question-by-question basis, *see Rendahl*, 746 F.2d at 555, and therefore the assertion of the privilege necessarily attaches only to the question being asked and the information sought by that particular question. Upon Elroy's assertion of his Fifth Amendment right, Rudy–Glanzer's counsel sought to draw the following four adverse inferences: (1) that Elroy took that test; (2) that Elroy took other similar tests; (3) that Elroy failed said tests; and (4) that Elroy committed the assault on Doe. *See* Proposed Jury Instruction. Because of the question-by-question nature of the privilege against self-incrimination, the only adverse inference that could have been obtained from Elroy's refusal to answer the above stated question is that he took the penile plethysmograph. Even though Elroy's counsel threatened to leave if such a line of ques-

tioning continued, *see* Deposition Transcript at 45, nothing legally prevented Rudy–Glanzer's counsel from asking Elroy other questions such as "did you ever take similar tests?" or "did you ever fail such tests?"[1] Elroy would have been within his rights to assert his Fifth Amendment privilege against self-incrimination to each of these other questions. However, these other questions never came and no privilege from which an adverse inference could be inferred was ever asserted to these other questions.[2]

 Like all evidence presented to the jury, the inquiry for the admissibility of the negative inference from Elroy's silence begins with the relevance threshold, and with the consideration of whether the value of presenting such evidence was substantially outweighed by the danger of unfair prejudice that drawing the adverse inference on that question would have represented to Elroy. *See* Fed.R.Evid. 403; *Brink's, Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir.1983).

 Several reasons exist for prohibiting Rudy–Glanzer from using any adverse inference from Elroy's failure to answer the above recited question. First, as explained above, the only possible negative inference that can be drawn from the unanswered question relates to the taking of the test, and not to whether Elroy molested Doe. Thus, to draw the inference that the test was taken, Rudy–Glanzer has to offer some other proof that indeed such an event occurred. *See LaSalle Bank Lake*

*View*, 54 F.3d at 391. She has failed to do so. No other evidence pertaining to Elroy's supposed taking of the test was developed by Rudy–Glanzer.

 Second, Rudy–Glanzer has failed to show that the result of such test, if taken, would be admissible as evidence in a court of law. In fact, courts are uniform in their assertion that the results of penile plethysmographs are inadmissible as evidence because there are no accepted standards for this test in the scientific community. *See United States v. Powers*, 59 F.3d 1460, 1471 (4th Cir.1995) (affirming district court's ruling that penile plethysmographs fail the "scientific validity" prong of the *Daubert* test which provides the standard for the admissibility of such scientific evidence) (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Therefore, even though courts have accepted that penile plethysmographs can help in the treatment and monitoring of sex offenders, these tests have no indicia of reliability as evidence at trial. *See, e.g. State v. Spencer*, 119 N.C.App. 662, 459 S.E.2d 812, 814–16 (1995) (excluding evidence of such test results); *State v. Emery*, 156 Vt. 364, 593 A.2d 77, 78–79 (1991) (noting validity of such test as part of treatment of sex offenders). As such, Rudy–Glanzer's right to a fair proceeding is not curtailed because this evidence, even if discovered, would not have made its way into the court room.

---

1. Rudy–Glanzer's counsel at oral argument admitted that he could have proceeded with further questioning on those lines at the deposition. Moreover, it is beyond dispute that Elroy's refusal to answer further questions on this topic at the deposition could have prompted Rudy–Glanzer to bring a motion to compel.

2. A hypothetical can best illustrate this concept: Within a civil suit, a defendant is asked the question "did you ever pick up the gun?" The defendant refuses to answer asserting his Fifth Amendment privilege. The plaintiff then introduces into evidence the fact that defendant's fingerprints were found on the

gun. The jury then may be instructed that from defendant's silence, it can infer that defendant picked up the gun. However, it cannot be instructed that it can infer from defendant's refusal to answer that particular question, that the defendant fired the gun, or that he disposed of the gun at the crime scene. That would be constructing an inference on another inference. These other inferences could only come into play if the specific questions pertaining to such inferences are asked, are met with a Fifth Amendment privilege response, and are corroborated by other evidence to the specific fact being questioned.

Third, and related to the second reason just articulated, because of the test's unreliability, the prejudice to Elroy would far outweigh the probative value of the negative inference and thus the threshold relevance inquiry under Fed.R.Evid. 403 is not satisfied. It is easy to imagine the scenario that would have taken place had Rudy–Glanzer's counsel asked at trial the same question that he did during Elroy's deposition. Upon asking the question, Elroy's counsel would have objected on relevance grounds, linking the unreliability of the test to unfair prejudice, and the trial judge would have sustained such an objection, as he did through his rulings on the various motions in limine, and thus Elroy would have never had to assert his Fifth Amendment right to begin with. Therefore, it is hard to imagine why we should let the negative inference stemming from the events at the deposition come into the court room when no invocation of the Fifth Amendment privilege against self-incrimination would have occurred in the first place had the question been asked to Elroy directly at trial.

For the same reason, the negative inference fails to meet the first prong of the balancing test outlined in *Serafino*. *See Serafino*, 82 F.3d at 518–19. Under this prong, the need for the information contained in the question has to be substantial. *See id.* Because of the legally irrelevant, and consequently inadmissible, nature of the information that Rudy–Glanzer's counsel was seeking to obtain by asking Elroy about the penile plethysmograph, Rudy–Glanzer cannot show any need, let alone a substantial one, for that information.

Fourth, Elroy was under no duty to reveal the information requested by Rudy–Glanzer. He was free under the law to answer or not and he chose not to. The Fifth Amendment's protections against self-incrimination would be undermined if, absent an affirmative duty of candor or other corroborating evidence, a party was penalized for exercising a constitutionally guaranteed right in the way that Elroy did.

Rudy–Glanzer complains that if we uphold the district court's decision to preclude a negative inference from Elroy's assertion of his Fifth Amendment right, "then every time an individual invokes the privilege, the Court will be required to analyze the underlying evidence and determine its admissibility prior to any ruling on the actual claim of Privilege." However, as seen above, a case-by-case analysis with a balancing test which weighs the need for the information being sought (and consequently its admissibility at trial) against the afforded constitutional protections is exactly what the law requires from the district court. Therefore what Rudy–Glanzer's argument amounts to is that we should prevent the district court from following the law. Because the district court applied the correct legal standards, it properly prevented an adverse inference regarding Elroy's exercise of his constitutionally guaranteed right against self-incrimination from reaching the jury.

B. *Evidence of Prior Sexual Misconduct*

Rudy–Glanzer next argues that the district court erroneously excluded evidence of an incident in which Elroy allegedly molested a twelve-year-old girl approximately fifteen years before the events at issue in this case took place. In making this argument, Rudy–Glanzer urges us to hold that Fed.R.Evid. 415, which allows for propensity evidence against an alleged sexual offender in civil suits, trumps the dictates of Fed.R.Evid. 403, which prevents evidence from reaching the jury if its value is outweighed by its possible unfair prejudice to the party against whom the evidence is offered. *See* Fed.R.Evid. 403 & 415. This issue is of first impression in this circuit.

Fed.R.Evid. 415 provides, in relevant part, that "[i]n a civil case in which a claim for damages or other relief is predicated on a party's alleged commission of

conduct constituting an offense of sexual assault or child molestation, evidence of that party's commission of another offense or offenses of sexual assault or child molestation is admissible...." This new evidentiary rule,[3] together with its companions Fed.R.Evid. 413 (Evidence of Similar Crimes in Sexual Assault Cases) and Fed.R.Evid. 414 (Evidence of Similar Crimes in Child Molestation Cases), was passed to make an exception to Fed.R.Evid. 404(b), which imposed a blanket prohibition on propensity evidence. *See United States v. LeCompte,* 131 F.3d 767, 769 (8th Cir. 1997); *United States v. Meacham,* 115 F.3d 1488, 1491 (10th Cir.1997).

To determine whether Fed.R.Evid. 415 applies to evidence that a party is seeking to introduce at trial, courts adopt a three-step inquiry. *See Frank v. County of Hudson,* 924 F.Supp. 620, 625–26 (D.N.J.1996). First, the defendant must be accused of an offense of sexual assault or child molestation; second, the evidence being proffered must relate to the commission of another offense of sexual assault or child molestation; and last, the evidence has to be relevant. *See United States v. Guardia,* 135 F.3d 1326, 1328, 1332 (10th Cir.1998) (discussing Fed.R.Evid. 413's relation to Fed.R.Evid. 403). With respect to this last prong, it is generally accepted that a defendant with a propensity to commit acts similar to those charged is more likely to have committed the charged act than another and therefore such evidence is relevant and in conformity with the standards set out in Fed.R.Evid. 401 & 402. *See* Fed.R.Evid. 401 (stating that evidence is relevant if it has a tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Fed.R.Evid. 402 (stating that only relevant evidence is admissible at trial); *Old Chief v. United States,* 519 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

Courts which find that the evidence proffered meets the three criteria outlined above, then subject that same evidence to the dictates of Fed.R.Evid. 403 which provides that the district court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice" to the party against whom the evidence is offered. Fed.R.Evid. 403; *see United States v. Sumner,* 119 F.3d 658, 661 (8th Cir.1997). This is confirmed by the legislative history of Fed.R.Evid. 413–415 because Rep. Susan Molinari, the proponent of the new evidentiary rules, while stating that these new rules were specifically intended to limit Fed.R.Evid. 404(b) in this area, was solicitous in pointing out that "the general standards of the rules of evidence" such as Fed.R.Evid. 403 still applied to the evidence covered by the new rules. *See* 140 Cong. Rec. 23,603 (1994).

Because of the inherent strength of the evidence that is covered by Fed.R.Evid. 415, when putting this type of evidence through the Fed.R.Evid. 403 microscope, a court should pay "careful attention to both the significant probative value and the strong prejudical qualities" of that evidence. *See Guardia,* 135 F.3d at 1330. Hence, the factors that the court should consider in deciding whether to admit this type of evidence should include the similarity of the prior acts to the acts charged, *see United States v. Edwards,* 69 F.3d 419, 436 (10th Cir.1995) (engaging Fed.R.Evid. 403 analysis of evidence of prior bad acts admissible under Fed.R.Evid. 404(b)), the closeness in time of the prior acts to the acts charged, *see id.* (same), the frequency of the prior acts, the presence or lack of intervening circumstances, and the necessity of that evidence beyond the testimonies already offered at trial, *see Guardia,* 135 F.3d at 1331. In light of the sensitive nature of the evidence proffered, it is important that the district court fully evaluate the factors enumerated

---

3. Fed.R.Evid. 413, 414, and 415 became effective July 9, 1995.

above, and others that might arise on a case-by-case basis, and make a clear record concerning its decision whether or not to admit such evidence. *See id.*

We find the reasoning adopted by the Tenth and Eighth Circuits regarding the subservience of Fed.R.Evid. 415 (and its companion rules) to Fed.R.Evid. 403 is persuasive and we adopt it as a rule of law for this circuit. Under such balancing test, we review the district court's decision to exclude evidence of Elroy's alleged prior misconduct for an abuse of discretion. *See Gilbrook,* 177 F.3d at 858.

The district court's decision to exclude the testimony of Elroy's alleged prior sexual misconduct came in two phases. First, before trial, the district court, in ruling on numerous motions in limine, indicated that it was leaning towards exclusion of this evidence but would allow an offer of proof on it. *See* Order at 9–11. In making its decision, the district court explicitly relied on Fed.R.Evid. 403. It noted various of the factors enumerated above including, "the remoteness in time" of the prior incident (approximately 15 years), the lack of similarities between the two incidents, and the lack of any "evidence of an ongoing . . . pattern of sexual assault." *Id.* The district court also carefully considered the lack of reliability of the witness to the prior incident, who admitted to being highly intoxicated at the time, and commented that there was a high risk of confusion as to the central issue of whether Elroy molested Doe.

The evidence proffered by Rudy–Glanzer meets the first three criteria illustrated above: Elroy was accused of child molestation, the prior evidence involved alleged child molestation committed by Elroy, and such evidence would be relevant to show propensity. The sole issue is whether this evidence meets the admissibility threshold dictated by Fed.R.Evid. 403.

After hearing the testimony of the alleged victim of the prior incident at Rudy–Glanzer's offer of proof, the district court confirmed its preliminary decision not to admit the evidence. The district court explicitly noted the caselaw illustrated above subjecting otherwise admissible evidence under Fed.R.Evid. 415 to the limitations of Fed.R.Evid. 403. *See* Trial Transcript at 87–91. The district court reiterated the factors used under the Fed. R.Evid. 403 balancing test, as well as its concern with the reliability of the alleged victim of the prior incident. *See id.* at 88. It noted that although there were similarities between the two alleged incidents, there were also important differences (one took place at a party, the other in private; one alleged victim was twelve years-old, the other three-years-old; one involved a gun, the other did not). The district court concluded that the differences outweighed the similarities. *See id.* at 88–89. It also noted the large time lapse between the two events without any intervening alleged misconduct. *See id.* at 89. The district court ruled that the risk of unfair prejudice to Elroy far outweighed the probative value of the evidence.

Given the exhortation to district courts that they provide a detailed record of their findings and reasons for their decisions, it is difficult to imagine a scenario in which a district court could do more than the district court did in this case. In fact, the district court's actions were textbook perfect. The district court twice gave exhaustive accounts for why it was excluding the evidence, the second time coming after having allowed a detailed offer of proof on behalf of Rudy–Glanzer. The reasons articulated for the exclusion follow closely the factors enunciated above that a district court should consider in these circumstances. The events were dissimilar for the reasons articulated by the district court, there was a significant time lapse between the two incidents, there was no evidence of any intervening misconduct on Elroy's part, and the prior victim was confessedly intoxicated at the time of the prior incident. Under the Fed.R.Evid. 403

balancing test, substantial prejudice outweighed any value that this evidence would have had at trial and therefore the district court did not abuse its discretion in excluding it.

### C. Attorney Misconduct

■ Rudy–Glanzer's last argument is that Elroy's counsel's references at trial to facts that the district court ruled were inadmissible prejudiced the jury against her and resulted in an unfair proceeding.

■ To warrant reversal on grounds of attorney misconduct, the flavor of the misconduct "must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *McKinley v. City of Eloy,* 705 F.2d 1110, 1117 (9th Cir.1983) (quoting *Standard Oil Co. v. Perkins,* 347 F.2d 379, 388 (9th Cir.1965) (internal quotation marks omitted)); *see Cooper v. Firestone Tire & Rubber Co.,* 945 F.2d 1103, 1107 (9th Cir. 1991). In making this evaluation, we must bear in mind that the trial court "is in a far better position to gauge the prejudicial effect of improper comments than an appellate court which reviews only on the cold record." *Kehr v. Smith Barney, Harris Upham & Co.,* 736 F.2d 1283, 1286 (9th Cir.1984).

The alleged attorney misconduct that Rudy–Glanzer refers to concerns Elroy's counsel's inferences that Rudy–Glanzer might have set her daughter up to lie about the events to exact revenge on her husband Barry for a messy divorce, and because of some traumatic event that Elroy claims occurred to Rudy–Glanzer early in her life. The district judge emphatically ruled that it would not allow such a line of questioning on relevance grounds. *See*

Trial Transcript at 619–20. Rudy–Glanzer asserts that despite such a warning, Elroy's counsel continuously raised such an inference and that this infected the whole trial.

■ Rudy–Glanzer points to various points in the trial where Elroy's counsel raised questions that were allegedly improper. Rudy–Glanzer's counsel objected to each question, and the objections were generally sustained on relevance grounds. In sustaining such objections the district court sometimes simply stated "sustained." *Id.* at 305. Other times the judge was more emphatic in his sustaining of Rudy–Glanzer's objection by warning Elroy's counsel that his line of questioning was "out of bounds." *Id.* at 294. In yet other occasions, the judge would give the jury a limiting instruction such as "I will instruct the jury to disregard the last response," *id.* at 212, or "the jury's instructed to disregard Counsel's last comment," *id.* at 712–13. Out of a trial transcript that is 717 pages long, Rudy–Glanzer has identified three episodes (at pp. 209–211, 294–311, & 712) which in her view constitute sufficient permeation to justify a finding of prejudice.[4]

■ The small quantity of the alleged improper episodes counsels against giving credence to Rudy–Glanzer's argument. Moreover, at every step of the way, the district court sustained the objections and instructed the jury to ignore the statements being proffered by Elroy's counsel. There is a strong presumption that the curative instructions given by the district court were followed by the jury and therefore we so presume. *See United States v. Pavon,* 561 F.2d 799, 803 (9th Cir.1977). What Elroy's counsel's questioning amounts to is a tactical attempt to elicit

---

4. Rudy–Glanzer also classifies the questioning of the expert witness, Dr. Chappius, as an episode of misconduct. This questioning came at the behest of the district court which directed Elroy's counsel to lay a foundation for the possible relevance of Rudy–Glanzer's divorce and past history of being a victim of

child abuse. Therefore, counsel's compliance with a court directive cannot be taken as an episode of misconduct, even though, after hearing the testimony, the district court ruled that no such foundation had been laid. *See* Trial Transcript at 619–20.

information that he claims might be relevant to the understanding of the facts of this case. Even though these attempts sometimes verged on the improper, they were always contained by the swift action of both Rudy–Glanzer's counsel and the district judge. A few sustained objections dispersed over the course of a trial, coupled with limiting jury instructions, cannot suffice to meet the high "permeation" standard necessary to invalidate the verdict of a trial. Therefore, the district court correctly ruled that if there were any attorney misconduct, it did not suffice to warrant granting Rudy–Glanzer's motion for a new trial.

AFFIRMED.