# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
### October 10, 2016 Session

## IN RE ALFONZO E. ET AL.

### Appeal from the Juvenile Court for Davidson County
### No. 202150     Sheila Calloway, Judge

_____

### No. M2016-00867-COA-R3-PT – Filed October 26, 2016

_____

The mother of three sons appeals the termination of her parental rights. A juvenile court magistrate determined that one son was the victim of severe abuse and that the other two sons were dependent and neglected. The magistrate also found that the mother was the perpetrator of this abuse, dependency, and neglect. The magistrate's order was not appealed. All three sons were placed with the same foster mother. They remained with her for around two years during which time they had some visitation with their biological mother. Subsequently, the Department of Children's Services filed a petition to terminate the mother's parental rights alleging severe abuse and persistence of conditions as grounds for termination. *See* Tenn. Code Ann. § 36-1-113(g)(3)-(4). The mother opposed the petition, and the children's maternal grandmother and uncle each filed separate petitions for custody. After two hearings, the trial court found that DCS had proven both alleged grounds for termination by clear and convincing evidence and that terminating the mother's parental rights was in the best interests of the children. The court also dismissed the petitions for custody filed by the grandmother and the uncle. The mother appealed, arguing that termination was not in the best interests of the children and that the trial court erred by failing to place the children with their grandmother as a less drastic alternative to foster care. Mother also argues that DCS failed to make a diligent search for the children's fathers. The evidence does not preponderate against the trial court's best-interest findings, and the mother cannot appeal the dismissal of the grandmother's petition or the termination of the fathers' parental rights. Additionally, by the time a court considers whether to terminate parental rights, it is too late to bring a less drastic alternative before the court. Accordingly, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

L. Willis Jones, Nashville, Tennessee, for the appellant, Evelia E.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Laura A. Stewart, Nashville, Tennessee, Guardian *ad litem*.

**OPINION**

Evelia E. ("Mother") is the mother of three minor sons, Alfonzo, Brayan, and Abraham (collectively, "children"). Alfonzo and Brayan are the children of one father, and Abraham is the child of another father.

On July 4, 2013, the Tennessee Department of Children's Services ("DCS") received a referral alleging that Abraham was being physically abused. An investigation revealed that Mother was Abraham's sole caretaker and that Abraham had suffered three injuries that required hospitalization over a five-month period (a fractured femur, a fractured tibia, and hematoma under his tongue). When Mother was interviewed during the investigation, she was unable to provide an explanation for the broken femur. However, she explained that the tibia fracture occurred because Abraham caught his leg in his crib and that the hematoma occurred when Abraham fell off the couch with either a bottle or pacifier in his mouth. On July 9, 2013, a juvenile court magistrate issued an emergency protection order placing the children in DCS custody and appointing a guardian *ad litem* for them. All three children were eventually placed with the same foster mother.

Subsequently, criminal charges related to Abraham's injuries were brought against Mother, and Mother was incarcerated for several months until she posted bail. Initially, Mother was prohibited from having contact with her children as a condition of her bond. However, that condition was later modified, and Mother was allowed supervised visitation with the children.

In May 2014, the juvenile court magistrate issued an "Order of Adjudication and Disposition" that described the investigation into Abraham's injuries and found that "these injuries occurred either due to a negligent level of lack of supervision of the child, or direct and intentional action that resulted in injury to the child." As a result, the magistrate found that Abraham was "an abused, severely abused and dependent/neglected child . . ." and that Alfonzo and Brayan were "dependent/neglected child[ren] pursuant to

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Tenn. Code Ann. § 37-1-102(b)(12)(B)(F)&(G)." The magistrate also found that Mother was the perpetrator of this abuse, dependency, and neglect. Although Mother filed a petition to rehear, she later struck that petition, and the magistrate's order was not appealed.

In February 2015, DCS filed a petition to terminate the parental rights of Mother and both fathers. The children's uncle and maternal grandmother ("Grandmother") filed separate petitions for custody. In November 2015, the trial court issued an order stating "[i]t appears that [DCS] has filed an affidavit of diligent search and that the ordinary service of process is unable to be achieved upon the [fathers]." Service on both fathers was obtained by publication in *The Tennessean*. *See Turner v. Turner*, 473 S.W.3d 257, 274-75 (Tenn. 2015) (discussing the requirements for dispensing with personal service of process in proceedings to terminate parental rights).

Trial occurred in two hearings: one in December 2015 and one in February 2016.[2] Because Mother's criminal trial had not yet occurred, the trial court instructed Mother about asserting her Fifth Amendment privilege against self-incrimination before Mother testified. These instructions included the admonition that, because this trial was a civil rather than criminal proceeding, the trial court could draw a negative inference if Mother refused to answer any questions. Mother was questioned about how Abraham's injuries occurred and asked whether there was "anything at all that [she] would do differently" if the trial court returned the children to her custody. Mother asserted the Fifth Amendment in response to these and all other questions.

Crystal Parks, a former DCS caseworker, testified that initially Mother was "willing to work" with her. Later, however, Mother "decided she didn't want to work a plan." According to Ms. Parks, Mother never expressed regret or took responsibility for what happened to Abraham.

Sivhon Hickerson, a caseworker at a private family services company, testified that Mother had four hours of visitation per month, usually in two two-hour sessions. She stated that Mother attended each session, brought food for the children, and interacted with them. Visitation never had to be stopped because Mother acted inappropriately. Ms. Hickerson also testified that the children referred to their foster mother as "Mom" or "Mommy" but did not refer to Mother that way.

Ms. Hickerson stated that Mother had trouble controlling the children on several occasions. There were several times when Ms. Hickerson "had to step in just to make sure things didn't get too out of hand." She testified that "[u]p until the last visit there were still issues with how to correct behavior. I think [Mother] did get a little more

---

[2] A brief hearing occurred in January 2016, but it was continued due to inclement weather.

confident about telling them, you know, 'no' and trying to correct. But there were still issues with the interactions there and the behavior issues." Ms. Hickerson also stated that she was concerned that Mother was idealizing the children and her ability to parent. According to her, "I just brought up, you know, having three boys is a lot for anybody. And she -- you know, she said it was a lot when she had them before, but she thought now that they were older that it would be easier for her and that it would go a lot smoother now that they were older."

Ms. Hickerson testified that she met with Mother to talk about parenting and that she modeled some appropriate methods of discipline for Mother. Ms. Hickerson stated that Mother was trying to make use of the methods that were modeled for her. Ultimately, however, Ms. Hickerson stated that: "I think the attempt was there, but there was still no reaction from the boys at all. It was almost like they didn't even hear what she was saying, and she wasn't persistent enough to try to force the issue."

Grandmother attended the December 2015 hearing and testified that she lived in Mexico with her husband, two daughters, and an adult grandson. She admitted she had not met the children prior to the commencement of these proceedings; nevertheless, she intended to move the children to Mexico if she was awarded custody. Grandmother did not attend the February hearing because she was recovering from surgery and her mobility was limited.

Maria Troche, the children's foster mother, testified that Abraham began living with her in September 2013 and that Alfonzo and Brayan joined Abraham in October 2013. Ms. Troche is a nurse practitioner. She speaks both Spanish and English and wants to raise the children to be bilingual.

Ms. Troche testified about how the children had changed while in her care. Brayan is a "pleaser" and a "very, very sweet child." Ms. Troche testified that Brayan had "some attachment struggles" because he bonds easily with others. Alfonzo "went from an angry little boy" to a confident child who is "very loving and caring of his brothers." Likewise, Abraham had developed a strong personality and had begun walking. Ms. Troche testified that she loved the children and wanted to adopt them.

In March 2016, the trial court issued an order terminating Mother's parental rights. The trial court found that two grounds for terminating Mother's parental rights existed. First, a prior court order included a finding that Mother had committed severe child abuse. *See* Tenn. Code Ann. § 36-1-113(g)(4). Specifically, the trial court found that:

> The children were adjudicated to be dependent and neglected . . . by an Order entered by the Juvenile Court of Davison County on May 5, 2014. That same Order adjudicated Abraham . . . to be the victim of severe abuse . . . and Mother to be the perpetrator of that abuse. In that the Order

- 4 -

was not appealed, it is a final Order and, as such, is grounds for termination of Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

Second, the trial court found that the conditions that led to the removal of the children persisted. *See* Tenn. Code Ann. § 36-1-113(g)(3). Regarding this ground, the trial court found that:

> Because of the severe abuse finding, Tenn. Code Ann. §§ 37-1-167 and 37-1-130(c) require that the Court must find by clear and convincing evidence that a threat to the children's safety no longer exists in order to return them to their Mother. Again, taking a negative inference from Mother's assertion of her Fifth Amendment right against self-incrimination, the Court has no information as to the cause of Abraham's injuries and no assurance that such abuse will occur again. Thus, the Court finds that the children have been removed from Mother's custody for well over two years, with no end in sight. The Court must presume that the conditions which led to the removal of the children from Mother's home still exist and there is little likelihood that these conditions will be remedied at an early date so that the children can be returned to her in the near future. Continuing to allow the children to languish in foster care only to preserve the parent/child relationship with no assurance the Court will ever be able to find it safe to return the children greatly diminishes their chance of an early integration into a stable and permanent home.

The trial court also concluded that it was in the children's best interest to terminate Mother's parental rights. The trial court found that Mother had not made an adjustment of circumstances to make it safe for the children to return to her and that the children no longer had a meaningful relationship with any of their biological parents. In contrast, the children's foster mother loved the children and was willing to "raise them to the age of majority and beyond." Further, the court found that the children had been in the foster home for two years and that disrupting that situation would be harmful to them.

The trial court considered Grandmother's petition for custody as part of the best-interest analysis. The court found that the children were U.S. citizens, had never been to Mexico, and did not know Grandmother. The court also found that Grandmother had recently had surgery and that the children needed someone "who is able to keep up with them . . . ."

In addition to terminating Mother's parental rights, the trial court also terminated the parental rights of both fathers and dismissed both Grandmother's and the uncle's petitions for custody.[3] Only Mother appealed.

## STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R.*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)).

"In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

## ANALYSIS

On appeal, Mother contends that terminating her parental rights was not in the best interests of the children. Additionally, Mother contends that the trial court erred by dismissing Grandmother's petition for custody and that DCS failed to find a "less drastic alternative" because it did not make a diligent search for the children's fathers.

### I. TERMINATION OF MOTHER'S PARENTAL RIGHTS

On appeal, Mother does not challenge the trial court's findings that there are grounds to terminate her parental rights. Nevertheless, we must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *Id.* at 525-26 (citing *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010)).

---

[3] The uncle did not appear for trial, and his petition was dismissed for failure to prosecute.

A. Grounds for Termination

The trial court found that two grounds for termination existed: that Mother had committed severe child abuse and that the conditions that led to the removal of the children persisted. *See* Tenn. Code Ann. § 36-1-113(g)(3)-(4).

1. Severe Child Abuse

The ground called "severe abuse" exists when "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court . . . ." Tenn. Code Ann. § 36-1-113(g)(4). This ground also exists when the parent "is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against the child who is the subject of the petition *or against any sibling or half-sibling of such child . . . .*" *Id.* (emphasis added).

This court has previously held that the doctrine of res judicata prevents parents from relitigating the issue of whether they have abused their children. *In re Dakota C.R.*, 404 S.W.3d 484, 497-98 (Tenn. Ct. App. 2012). Thus, parents may be precluded from contesting the issue of whether they committed severe child abuse when the issue was fully litigated in a dependency and neglect proceeding and the final order from that proceeding indicates that the parent committed severe child abuse. *See id.* at 497.

In this case, the juvenile court magistrate issued an order finding that Mother had severely abused Abraham. Although Mother initially filed an appeal of this order, she struck that petition, and the magistrate's order became final. Consequently, the finding that Abraham was the victim of severe abuse caused by Mother is res judicata. Abraham is a half-sibling of Brayan and Alfonzo. Thus, Abraham was found to be a severely abused child by a court and that determination supports a finding that a half-sibling of Brayan and Alfonzo was the victim of severe child abuse.

Accordingly, based on the preponderance of the evidence, this ground for termination has been established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(g)(4).

2. Persistence of Conditions

The trial court also found that DCS had established the ground of persistence of conditions by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(g)(3). This ground exists if, after a child has been removed by a court order for six months, (1) the condition that led to the child's removal persist; (2) there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and (3) the continuation of the parent-child relationship greatly

diminishes the child's chances of early integration into a safe, stable, and permanent home. *See id.*

The trial court's finding that Mother had not remedied the conditions that led to the severe abuse was based on a negative inference that the trial court drew when Mother invoked her Fifth Amendment privilege against self-incrimination. In civil cases, the trier of fact may draw a negative inference from a party's invocation of the Fifth Amendment if there is independent evidence of the fact to which a party refuses to testify. *See Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 506 (Tenn. 2012); *In re Nickolas E.*, No. M2009-01888-COA-R3-PT, 2010 WL 454809, at *6 (Tenn. Ct. App. Feb. 9, 2010) ("[T]here is no constitutional infirmity in the ability of the trial court to draw a negative inference from the parent not testifying or to consider evidence obtained over the parent's Fifth Amendment objection in a proceeding to terminate that parent's parental rights."). The privilege attaches only to the question being asked and the information sought by that particular question. *Akers*, 387 S.W.3d at 507 (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000)). Consequently, a negative inference is only available on a question-by-question basis. *See id.* at 506-07.

Here, Mother was specifically asked what she would do differently if the children were returned to her custody. In general, this question seeks information about whether and how the conditions in Mother's life have changed. Mother asserted the Fifth Amendment regarding this question. Thus, a negative inference is available if there is independent evidence about the conditions in Mother's life and whether those conditions have changed. *Id.* at 506.

Such evidence is present in this record. Ms. Parks testified that Mother stopped cooperating with her parenting plan and never expressed regret or took responsibility for what happened to Abraham. Ms. Hickerson testified that, although Mother's visitation was never cut short, the children misbehaved and Mother had difficulty disciplining them or controlling their behavior. Further, Ms. Hickerson expressed concern that Mother had an idealized view of the children and her parenting ability and believed that it would be easier to be a parent now that the children were older. Although Mother made some progress in her parenting skills, Ms. Hickerson stated that "[i]t was almost like [the children] didn't even hear what she was saying, and she wasn't persistent enough to try to force the issue."

This testimony is independent evidence that the conditions that led to the findings in the Order of Adjudication and Disposition had not changed and were unlikely to change in the future. As a result, the trial court was permitted to draw a negative inference about these facts from Mother's invocation of the Fifth Amendment.

Moreover, no child who has been found to be a victim of severe child abuse can be returned to the custody of the person who engaged in or failed to protect the child from

that abuse "unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse." *See* Tenn. Code Ann. § 37-1-130(c). Abraham was found to be a victim of severe child abuse, and therefore Mother was required to demonstrate by clear and convincing evidence that he would be provided with a safe home before he could be returned to her custody. *See id.* Mother's refusal to testify makes it impossible to determine by clear and convincing evidence that Abraham would be provided with a "safe home free from further . . . abuse." *See id.*

Based on the foregoing, the trial court correctly found that grounds for terminating Mother's parental rights existed.

## B. Best Interests of the Children

Once a court finds that grounds for termination of parental rights exit, the interests of the parent and the child diverge, and the focus of the proceedings shifts to the best interest of the child. *See In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Ascertaining a child's best interest is a fact-intensive inquiry that must be conducted from the child's perspective. *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). This inquiry requires courts to weigh the evidence regarding the statutory factors listed in Tenn. Code Ann. § 36-1-113(i) as well as the evidence about any other relevant factors. *See id.* The relevancy and weight of each factor depends upon the unique facts of each case. *Id.* Consequently, in certain cases the consideration of one factor may dictate the outcome of the best-interest analysis. *See id.*

The trial court found that the children no longer had a meaningful relationship with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(4). The court also found that the foster mother loved the children and was willing to "provide for them and raise them to the age of majority and beyond." Further, the court found that the children were "stable and thriving" with their foster mother, and disrupting that living situation would be harmful to them. The evidence supports these findings.

Moreover, based on the record before us, the criminal case against has not yet been resolved. Mother may be subject to further incarceration, which would greatly impact her ability to provide the children with a safe home. *See* Tenn. Code Ann. § 36-1-113(i)(1), (7). In addition, the finding that Mother is responsible for Abraham's injuries and the dependency and neglect of both Brayan and Alfonso is a highly significant part of the best-interest analysis in this case. *See* Tenn. Code Ann. § 36-1-113(i)(6). By all accounts, the children are in a loving home that is free from abuse, dependency, and neglect. Removing them from this environment and placing them with a person who was previously found to be responsible for these conditions does not appear to be in their best interests.

Based on the foregoing, the evidence does not preponderate against the trial court's findings, and those findings establish, by clear and convincing evidence, that termination of Mother's parental rights is in the best interests of the children.

## II. MOTHER'S OTHER ARGUMENTS

Mother contends that the trial court erred by dismissing Grandmother's petition for custody. Additionally, Mother argues that DCS failed to meet its "continuing duty to exercise reasonable efforts to find a less drastic placement for the children, including making a diligent search for the father of the children."

Mother cannot assert the rights of Grandmother and the fathers, and she does not have standing to appeal the denial of Grandmother's petition for custody or the termination of the fathers' parental rights. *See In re Joseph L.*, No. M2011-02058-COA-R3-PT, 2012 WL 2389609, at *7 n.4 (Tenn. Ct. App. June 25, 2012) (citing *In re Noel B.F.*, No. M2010-02343-COA-R3-PT, 2011 WL 3610427, at *8 (Tenn. Ct. App. Aug. 16, 2011)). The relief granted against Mother was the termination of her parental rights, and that is the only judgment that she can appeal. *See In re Noel B.F.*, 2011 WL 3610427, at *8.

Moreover, the failure to place a child with a relative is not a basis for reversing a trial court's decision to terminate parental rights. *See In re Joseph L.*, 2012 WL 2389609, at *7. Instead, arguments about less drastic alternatives must be raised in dependency and neglect proceedings. *See In re Deashon A.C.*, No. E2009-01633-COA-R3-PT, 2010 WL 1241555, at *8 (Tenn. Ct. App. Mar. 31, 2010) (quoting *In re O.J.B.*, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at *9 (Tenn. Ct. App. Nov. 2, 2009)); *In re K.L.D.R.*, No. M2008-00897-COA-R3-PT, 2009 WL 1138130, at *8 (Tenn. Ct. App. Apr. 27, 2009). By the time a court is considering whether to terminate a biological parent's rights, it is too late to bring a less drastic alternative before the court. *See In re Noel B.F.*, 2011 WL 3610427, at *9. Consequently, the trial court did not err by failing to place the children with Grandmother.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Evelia E.

_____
FRANK G. CLEMENT, JR., P.J., M.S.