**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEGAL AID SERVICES OF OREGON;
ARRON GUEVARA; JANICE MORGAN;
SHARON LEE SCHWARTZ; DONNA
SATHER,

   *Plaintiffs-Appellants,*

   and

OREGON LAW CENTER; DAVID
HENRETTY; DIANE SCHWARTZ SYKES;
LOREY FREEMAN; COMMUNITY
ALLIANCE OF TENANTS;
CAMPAIGN FOR EQUAL JUSTICE,

   *Plaintiffs,*

   v.

LEGAL SERVICES CORPORATION,

   *Defendant-Appellee,*

UNITED STATES OF AMERICA,

   *Defendant-Intervenor-Appellee.*

No. 08-35467

DC No.
CV 05-1444 PK

LEGAL AID SERVICES OF OREGON;
ARRON GUEVARA; JANICE MORGAN;
SHARON LEE SCHWARTZ; DONNA
SATHER; OREGON LAW CENTER;
DAVID HENRETTY; DIANE SCHWARTZ
SYKES; LOREY FREEMAN;
COMMUNITY ALLIANCE OF TENANTS,
*Plaintiffs,*

and

CAMPAIGN FOR EQUAL JUSTICE,

*Plaintiff-Appellant,*

v.

LEGAL SERVICES CORPORATION,

*Defendant-Appellee,*

UNITED STATES OF AMERICA,
*Defendant-Intervenor-Appellee.*

No. 08-35483
DC No.
CV 05-1444 PK

LEGAL AID SERVICES OF OREGON;
ARRON GUEVARA; JANICE MORGAN;
SHARON LEE SCHWARTZ; DONNA
SATHER,

*Plaintiffs,*

CAMPAIGN FOR EQUAL JUSTICE,

*Plaintiff,*

and

OREGON LAW CENTER; DAVID
HENRETTY; DIANE SCHWARTZ SYKES;
LOREY FREEMAN; COMMUNITY
ALLIANCE OF TENANTS,

*Plaintiffs-Appellants,*

v.

LEGAL SERVICES CORPORATION,

*Defendant-Appellee,*

UNITED STATES OF AMERICA,

*Defendant-Intervenor-Appellee.*

No. 08-35492

DC Nos.
CV 05-1444 PK
CV 05-1443 PK

ORDER AND
AMENDED
OPINION

Appeals from the United States District Court
for the District of Oregon
Paul J. Papak, Magistrate Judge, Presiding

Argued and Submitted
July 7, 2009—Portland, Oregon

Opinion Withdrawn and
Amended Opinion Filed June 4, 2010

Before: Harry Pregerson, Pamela Ann Rymer, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Pregerson

**COUNSEL**

Stephen S. Walters (argued), Allen Matkins Leck Gamble Mallory & Natsis, San Francisco, California, and Beverly C.

Pearman, Stoel Rives, Portland, Oregon, for plaintiffs-appellants Legal Aid Services of Oregon and LASO plaintiffs.

Don H. Marmaduke, Tonkon Torp, Portland Oregon, for plaintiffs-appellants Oregon Law Center and OLC plaintiffs.

Kent B. Thurber, Davis Wright Tremaine, Portland, Oregon, for plaintiff-appellant Campaign for Equal Justice.

William S. Freeman, Palo Alto, California, for defendant-appellee.

Matthew M. Collette, Civil Division, U.S. Department of Justice, Washington, DC, for defendant-intervenor-appellant.

## ORDER

The opinion and partially dissenting opinion filed on November 23, 2009, and reported at 587 F.3d 1006, are hereby withdrawn and replaced by an amended opinion and amended partially dissenting opinion filed concurrently with this order. With these amendments, the panel has voted to deny the petition for panel rehearing, with Judge Pregerson voting to grant the petition. Judge Rymer has voted to deny the petition for rehearing en banc and Judge Tashima recommends denial. Judge Pregerson has voted to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35(f). The petition for rehearing en banc is denied. No further petitions for rehearing will be entertained.

## **OPINION**

TASHIMA, Circuit Judge:

We must determine whether restrictions on lobbying, soliciting clients, and participating in class actions (collectively, the "Restrictions") that Congress has imposed on legal aid organizations that receive federal grants through the Legal Services Corporation ("LSC"), comport with the requirements of the First Amendment. In *Legal Aid Soc'y of Haw. v. Legal Serv. Corp.*, 145 F.3d 1017 (9th Cir. 1998) ("*LASH III*"), we upheld the Restrictions as facially constitutional. We concluded that LSC's program integrity rule ("PIR") permits grantees to channel restricted speech, paid for with non-federal dollars, through unrestricted affiliates, and thus, the Restrictions do not unconstitutionally condition the receipt of federal funds on the relinquishment of First Amendment rights. *Id.* at 1025.

Legal Aid Services of Oregon ("LASO"), Oregon Law Center ("OLC"), individual LASO and OLC attorneys and board members, and organizations representing LASO clients and private donors (collectively "Plaintiffs"), present a two-pronged attack on the Restrictions and PIR. First, they contend that the Supreme Court's decision in *Legal Serv. Corp. v. Velazquez*, 531 U.S. 533 (2001) ("*Velazquez III*") superseded *LASH III*, and that under *Velazquez III*, the Restrictions must be struck down as facially violative of the First Amendment. Next, they contend that, even if *LASH III* remains good law, LSC has applied the PIR *to them* in a manner that cuts off alternative avenues for engaging in protected speech.

The district court dismissed Plaintiffs' facial challenge to the Restrictions, granted summary judgment in favor of LSC on their as-applied challenge to the PIR, and denied their motion for a new trial.

We have jurisdiction to review the final judgment of the district court under 28 U.S.C. § 1291, and affirm.

**BACKGROUND AND PROCEEDINGS**

## I.   LSC and the Restrictions

In 1974 Congress enacted the Legal Services Corporation Act (the "1974 Act"), Pub. L. No. 93-355, 88 Stat. 378 (codified as amended at 42 U.S.C. §§ 2996-2996*l*), establishing LSC as an independent nonprofit corporation. LSC's mission is to distribute congressionally appropriated funds to qualifying organizations "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a).

Congress has restricted the activities of LSC grantees since the grant program's inception, and the scope of those restrictions has expanded over time. The 1974 Act, for example, provided that LSC funds could not be used to provide legal assistance in school desegregation cases, cases in which a client seeks to procure an abortion or compel an institution to provide an abortion, military desertion cases, any "fee-generating case," and collateral attacks on criminal convictions. *Id.* § 2996f(b). Further, every year between 1983 and 1996, Congress included an appropriations rider in its annual spending bill "purport[ing] to eliminate legislative lobbying and administrative advocacy" among LSC grantees. S. Rep. 104-392 at 3 (Sept. 30, 1996).

In 1996, responding to concerns that LSC had strayed from its core mission of "fund[ing] basic legal services for poor individuals," *id.* at 1, Congress imposed new restrictions on the activities of LSC grantees. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 504, 110 Stat. 1321, 1321-53-57 (1996) (the "1996 Act"), reenacted in the Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, § 502, 110 Stat. 3009, 3009-59-60 (1997). The 1996 Act enacted, and subsequent LSC regulations implemented, restrictions on: (1) attempts to influence

legislation and/or administrative rulemaking processes, 45 C.F.R. § 1612 *et seq.*; (2) initiation of, and participation in, class action lawsuits, *id.* § 1617 *et seq.*; (3) soliciting clients, *id.* § 1638 *et seq.*[1] The Restrictions apply to all of the activities of an LSC grantee, including those paid for by non-LSC funds. 45 C.F.R. § 1610.4.

## II.   PIR and the *LASH* Litigation

In 1997, in response to a federal district court's injunction declaring several of the 1996 Act's restrictions facially unconstitutional insofar as they applied to LSC grantees' non-federally funded activities, *see Legal Aid Soc'y of Haw. v. Legal Serv. Corp.* , 961 F. Supp. 1402, 1422 (D. Haw. 1997) ("*LASH I*"), LSC promulgated the PIR to clarify the circumstances under which a grantee could affiliate with an organization that engages in restricted activities.[2] *See* 45 C.F.R. § 1610.8. The PIR provides that:

> (a) A[n] [LSC grant] recipient must have objective integrity and independence from any organization that engages in restricted activities.

---

[1]The 1996 Act also prohibited LSC grantees from providing legal assistance to certain classes of aliens, seeking to reform welfare, litigating on behalf of prisoners, engaging in activity involving political redistricting, supporting certain advocacy training programs, and litigating cases related to abortion. *See Velazquez v. Legal Serv. Corp.*, 164 F.3d 757, 760 & n.2 (2d Cir. 1999) ("*Velazquez II*"). Those restrictions are not at issue in this appeal. Additionally, the parties agree that the 1996 Act's restrictions on claiming, collecting or retaining attorneys' fees is now moot, having been recently repealed by Pub. L. No. 111-117, § 533, 123 Stat. 3034, 3157 (Dec. 19, 2009). The attorneys' fees restriction thus is also no longer an issue in this appeal.

[2]The *LASH* plaintiffs consisted of several LSC grantee organizations, lawyers that worked for those organizations, an organization representing legal aid clients, and two organizations that provided funding to legal aid organizations. *LASH I*, 961 F. Supp. at 1406-07.

A recipient will be found to have objective integrity and independence from such an organization if:

> (1) The other organization is a legally separate entity;

> (2) The other organization receives no transfer of LSC funds, and LSC funds do not subsidize restricted activities; and

> (3) The recipient is physically and financially separate from the other organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. Whether sufficient physical and financial separation exists will be determined on a case-by-case basis and will be based on the totality of the facts. The presence or absence of any one or more factors will not be determinative. Factors relevant to this determination shall include but will not be limited to:

>> (i) The existence of separate personnel;

>> (ii) The existence of separate accounting and timekeeping records;

>> (iii) The degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and

>> (iv) The extent to which signs and other forms of identification which distinguish the recipient from the organization are present.

> (b) Each recipient's governing body must certify to [LSC] within 180 days of the effective date of this part that the recipient is in compliance with the

requirements of this section. Thereafter, the recipi-
ent's governing body must certify such compliance
to [LSC] on an annual basis.

*Id.*

LSC drafted the PIR to mirror the program integrity regula-
tions associated with federal grants provided under Title X of
the Public Health Service Act; regulations that withstood First
Amendment scrutiny in *Rust v. Sullivan*, 500 U.S. 173 (1991).
*See Velazquez II*, 164 F.3d at 761-62 (citing 62 Fed. Reg.
12101, 12101-04 (1997)). The restrictions at issue in *Rust*
prohibited Title X grantees from providing counseling con-
cerning the use of abortion as a method of family planning,
or engaging in any lobbying effort or legal action aimed at
encouraging abortion. *See Rust*, 500 U.S. at 179-80. A grant-
ee's affiliate could engage in restricted activities, but only if
the grantee and affiliate ensured legal, physical, and financial
separation. *See id.* at 180-81.

The *Rust* court rejected the Title X grantees' (and doctors
who worked for those grantees) claim that the restrictions
amounted to an unconstitutional condition. To prevail on such
a claim, the Court explained, a recipient of a federal subsidy
must show that it has been "effectively prohibit[ed] . . . from
engaging in [ ] protected conduct outside the scope of the fed-
erally funded program." *Id.* at 197. Because grantees were
free to engage in restricted activities through a legally sepa-
rate affiliate, the Court determined that they had failed to
establish an unconstitutional condition. The Court also con-
cluded that the challenged restrictions did not amount to
impermissible viewpoint discrimination, because Congress
had "not discriminated on the basis of viewpoint; it [ ] merely
chose[ ] to fund one activity to the exclusion of the other." *Id.*
at 193.

After the issuance of the PIR, the *LASH I* district court dis-
solved its injunction and entered summary judgment in favor

of LSC. *Legal Aid Soc'y of Haw. v. Legal Serv. Corp.*, 981 F. Supp. 1288, 1294, 1301 (D. Haw. 1997).

We affirmed the judgment of the district court, concluding that the Restrictions and PIR satisfy the standards set forth in *Rust. See LASH III*, 145 F.3d at 1024. Because the PIR did not force LSC grantees to "give up prohibited activities," but rather allowed them to engage in those activities so long as they were carried out through "separate and independent" entities, we concluded that, under *Rust*, the Restrictions were constitutional on their face. *See id.* at 1025. We rejected the *LASH III* plaintiffs' contention that the practical burdens associated with channeling restricted activities through separate affiliates amounted to an impermissible burden on the exercise of their free speech rights, but left open the possibility that they could challenge LSC's application of the PIR in a subsequent action. *Id.* at 1027.

## III.    *Velazquez* Litigation[3]

In 1997, legal aid organizations in New York, together with individual legal aid attorneys, clients, and donors, brought an action challenging several of the 1996 Act's funding restrictions.[4] *See Velazquez v. Legal Serv. Corp.*, 985 F. Supp. 323 (E.D.N.Y. 1997) ("*Velazquez I*"). The *Velazquez* plaintiffs sought a preliminary injunction declaring, in relevant part, that the challenged restrictions were facially violative of the First Amendment. *Id.* at 326. The district court denied the preliminary injunction motion, reasoning that the PIR was in all relevant respects identical to the program integrity regulations upheld in *Rust*; thus, that the plaintiffs were unlikely to succeed on the merits of their claim. *Id.* at 326-27.

---

[3]Because the *Velazquez* litigation sequence addressed the legal questions at issue in this case, we summarize it at length here.

[4]In addition to several restrictions not at issue in this appeal, the *Velazquez I* plaintiffs challenged the 1996 Act's bar on participating in class actions, engaging in lobbying, and soliciting clients. *Velazquez I*, 985 F. Supp. at 328.

The Second Circuit affirmed in part, and reversed in part. It agreed with the district court that, as a facial matter, the PIR provided LSC grantees with adequate alternative channels for engaging in protected expression, and thus there was no unconstitutional conditions violation. *See Velazquez II*, 164 F.3d at 767. The court concluded, however, that one of the challenged restrictions — the so-called "suits-for-benefits exception" — ran afoul of the First Amendment. *See id.* at 769-72. The suits-for-benefits exception provided that an LSC grantee could represent an eligible client seeking specific relief from a welfare agency, but only if the grantee refrained from challenging the validity of the underlying statutes and regulations. *Id.* at 769. Because it permitted funding for legal actions that accepted the validity of existing welfare laws, but denied it with respect to those that challenged the status quo, the *Velazquez II* court concluded that the suits-for-benefits exception was viewpoint discrimination subject to strict First Amendment scrutiny. *Id.* at 769-70.

The Supreme Court granted the LSC's certiorari petition, but declined to review the Second Circuit's judgment insofar as it upheld the other substantive restrictions. 532 U.S. 903 (Mem.) (2001) (denying the *Velazquez* plaintiffs' petition for certiorari). The Supreme Court — in a 5-4 decision that we discuss at length *infra* — agreed with the Second Circuit that the suits-for-benefits exception was unconstitutional. *Velazquez III*, 531 U.S. at 549.

The litigation then returned to the district court where the *Velazquez* plaintiffs pursued both an as-applied challenge to the PIR, and a facial challenge to the class action and solicitation restrictions. *Velazquez v. Legal Serv. Corp.*, 349 F. Supp. 2d 566 (E.D.N.Y. 2004) ("*Velazquez IV.*"). The district court dismissed the plaintiffs' facial challenge, but granted their application for a preliminary injunction on the as-applied challenge to the PIR, concluding that LSC's enforcement of the PIR "unduly burden[ed]" the plaintiffs' ability to use non-federal funds to engage in restricted activities. *Id.* at 611.

The Second Circuit affirmed in part, reversed in part, and vacated the district court's injunction. *Brooklyn Legal Serv. Corp. v. Legal Serv. Corp.*, 462 F.3d 219, 236 (2d Cir. 2006) ("*Velazquez V*"). The court agreed that the *Velazquez* plaintiffs' facial challenge to the substantive restrictions failed to state a claim, *id.* (summarily adopting the reasoning and conclusions of the district court with respect to plaintiffs' facial challenge), but concluded that the district court erred in applying an undue burden standard to the as-applied challenge to the PIR, *see id.* at 231. The proper standard, the court concluded, was whether grantees had "demonstrated as a factual matter that the [PIR] ha[d] not left them adequate alternative channels for protected expression." *Id.*

## IV.  LASO and OLC

LASO is a nonprofit legal aid organization and LSC grantee. It derives roughly 45 percent of its $6.5 million annual operating budget from LSC grants, and the remainder of its funding comes from other federal, state, and private sources. OLC is an independent legal aid organization that does not receive funding from LSC; thus, it is not subject to the Restrictions. The organizations share a common board of directors.

Since 1995, when LASO spun-off OLC, the two organizations have coordinated their respective delivery of legal services, with OLC providing many of the services that LASO cannot offer pursuant to the Restrictions. In addition to their common board, the two organizations coordinate their efforts by: (1) maintaining separate but adjoining office space; (2) co-counseling certain cases; (3) holding regular joint planning meetings; (4) maintaining a single litigation support unit to aid both OLC and LASO attorneys; (5) dividing the use of physical resources like libraries, computer services, and phone systems; and (6) coordinating training, priority setting, and information sharing regarding administration, finance, personnel, and other policies.

In May 2005, LASO submitted a new configuration pro-posal (the "Proposal") to LSC. Under the Proposal, LASO and OLC would merge into a single, nonprofit corporation with two financially separate divisions. The new organization would operate under the leadership of a single executive director, and the two divisions would share personnel in a variety of job categories.

LSC's Office of Legal Affairs issued a written opinion rejecting the Proposal. The opinion explained that "[i]n order to maintain program integrity from OLC, LASO must be a legally separate entity and must have greater physical and financial separation than set forth in the proposal." According to the declaration of Mark Freedman, LSC's Assistant General Counsel, LASO did not contact LSC to discuss the Proposal prior to submitting it, nor did it explore alternatives with LSC after receiving notice that the Proposal had been rejected. Freedman also stated that "the PIR would permit a limited number of individual LASO attorneys to work part-time for OLC, provided the organizations otherwise complied with the PIR in terms of legal, physical and financial separation overall."

## V.   Proceedings in this Case

In September 2005, Plaintiffs filed this action raising, in relevant part, facial and as-applied First Amendment claims, and seeking declaratory and injunctive relief.[5] The United States intervened to defend the constitutionality of the Restrictions and PIR.

LSC and the United States both filed motions to dismiss all

---

[5]The State of Oregon brought a separate action against LSC challenging the Restrictions and PIR on Tenth Amendment grounds. The district court dismissed the State's action and that dismissal was affirmed on appeal. *See Oregon v. Legal Serv. Corp.*, 552 F.3d 965 (9th Cir. 2009) (holding that Oregon lacked Article III standing to challenge the Restrictions).

of Plaintiffs' claims. The Magistrate Judge, in his Findings and Recommendations, recommended granting the motions as to all claims, except for Plaintiffs' as-applied First Amendment challenge to the PIR. The district adopted the recommendations in their entirety. Ultimately, in its Amended Order, the district court granted the motions to dismiss as to all of Plaintiffs' claims, except for the as-applied challenge to the PIR.[6]

The parties then engaged in a lengthy and contentious discovery process, with several disputed motions to compel. The district court denied Plaintiffs' requests for production of documents relating to LSC's interpretation and enforcement of the substantive Restrictions, but permitted a great deal of discovery regarding LSC's enforcement of the PIR.

In December 2007, LSC and the United States filed motions for summary judgment on Plaintiffs' remaining as-applied challenge, and the individual LASO attorneys filed a cross-motion for partial summary judgment. The court granted Defendant and Intervenor's motions and denied the LASO attorneys' motion. *See Legal Aid Serv. of Or. v. Legal Serv. Corp.*, 561 F. Supp. 2d 1187 (D. Or. 2008).

Plaintiffs then filed a motion for new trial or, in the alternative, to amend/correct the opinion and judgment. In their motion, Plaintiffs stated that they read the order as granting summary judgment in favor of LSC on both their as-applied challenge to the PIR, *and* their as-applied challenge to the Restrictions themselves — which they believed were legally distinct claims. The problem with the judgment, in Plaintiffs' view, was that district court's prior Amended Order had dismissed all of Plaintiffs' claims except for the as-applied challenge to the PIR. Had they known that the as-applied

---

[6]After the district judge filed the Amended Order, the parties consented to the Magistrate Judge's full jurisdiction over the case under 28 U.S.C. § 636(c).

challenge to the Restrictions was still at issue, Plaintiffs contended, they would have presented additional arguments and evidence.

After holding two hearings on the matter, the Magistrate Judge denied Plaintiffs' motion. He explained that Plaintiffs' inability to present additional arguments and evidence related to their as-applied challenge to the Restrictions "couldn't have impacted the ultimate decision," because the only issue before the court after the dismissal of Plaintiffs' facial challenge to the Restrictions was whether the PIR permitted Plaintiffs to access alternative channels for expressing protected speech.

Plaintiffs timely appealed, seeking review of the district court's dismissal of their facial challenge to the Restrictions, entry of summary judgment on their as-applied challenge, denial of their motion for a new trial, and denial of several motions to compel relating to LSC's enforcement of the Restrictions.

## STANDARDS OF REVIEW

Review of the district court's dismissal for failure to state a claim is de novo, "accept[ing] all factual allegations in the complaint as true and constru[ing] the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Review of the district court's entry of summary judgement is also de novo. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055 (9th Cir. 2002). Summary judgment is to be granted only if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to a material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c).

Review of the district court's ruling on a motion for a new trial is for abuse of discretion. *Doe ex rel. Rudy-Glanzer v.*

*Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). Review of its rulings limiting the scope of discovery are for "a clear abuse of discretion." *Blackburn v. United States*, 100 F.3d 1426, 1436 (9th Cir. 1996).

## DISCUSSION

### I. Plaintiffs' Facial Challenge to the Restrictions

Plaintiffs contend that *LASH III* is irreconcilable with the Supreme Court's subsequent decision in *Velazquez III*; thus, that we must reconsider the facial constitutionality of the Restrictions under the rubric set forth in *Velazquez III*. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (explaining that a three-judge panel of this court is not bound by circuit precedent where the subsequent decision of a higher court "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable"). Upon careful review of Justice Kennedy's opinion for the majority in *Velazquez III*, we agree with the district court that *LASH III* continues to control.

In striking down the suits-for-benefits exception, the *Velazquez III* court distinguished *Rust*, explaining that "viewpoint-based funding decisions can be sustained in instances . . . in which the government 'use[s] private speakers to transmit specific information pertaining to its own program.' " 531 U.S. at 541 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)). Where it endeavors to fund certain modes of *private* expression, however, "Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Id.* at 548-49. Because LSC's grant program subsidized private expression through the medium of free legal services, the Court concluded that *Rust* was not controlling. Justice Kennedy also observed that the suits-for-benefits exception "distorts the legal system by altering the traditional role of the attorneys," *id.* at 544, thereby "prohibit[ing] speech

and expression upon which courts must depend for the proper exercise of the judicial power," *id.* at 545.

According to Plaintiffs, *Velazquez III* announced a new First Amendment doctrine applicable in unconstitutional conditions cases — in essence a "distortion test" — eroding the foundation on which *LASH III* rested. They contend that in *Velazquez III*, as in this case, Congress chose to subsidize private expression through a particular medium, and then distorted the functioning of that medium by restricting the procedural tools and legal strategies that grantee attorneys were permitted to utilize in the course of their advocacy.

Defendant and Intervenor, for their part, contend that Plaintiffs read *Velazquez III* far too broadly. *See, e.g.*, Intervenor's Reply Br. at 23 (contending that *"Velazquez III* merely stands for the unremarkable proposition that the government may not impose viewpoint-based restrictions where it seeks to fund private speech"). Because the Restrictions do not discriminate against a particular viewpoint, they argue, *Velazquez III* is inapposite, and Justice Kennedy's discussion of the suits-for-benefits exception's distortionary effects does not disturb the holding in *LASH III*.

**[1]** We agree with the district court that Plaintiffs' distortion theory relies on a mistaken reading of *Velazquez III*. The *Velazquez III* Court analyzed the grantee plaintiffs' unconstitutional conditions claim through the lens of the Court's limited public forum cases.[7] *See* 531 U.S. at 544 ("As this suit

---

[7]A "limited public forum" is "a nonpublic forum that the government intentionally has opened to certain groups or for the discussion of certain topics." *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 908 (9th Cir.), *cert. denied*, 128 S. Ct. 143 (2007). As the Supreme Court has noted, limited public fora can exist "more in a metaphysical than in a spatial or geographic sense." *Rosenberger*, 515 U.S. at 830. Examples of such fora include a school mail system, *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46-47 (1983), a charitable contribution program, *see Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985), and a university program for subsidizing and distributing student publications, *see Rosenberger*, 515 U.S. at 830.

involves a subsidy, [the Court's] limited forum cases . . . may not be controlling in a strict sense, yet they do provide some instruction."); *see also Mezibov v. Allen*, 411 F.3d 712, 720 (6th Cir. 2005) (stating that "*Velazquez [III]* involved . . . a government funding program that the Court deemed a limited public forum for First Amendment purposes")*; Marijuana Policy Project v. United States*, 304 F.3d 82, 87 (D.C. Cir. 2002) (stating that *Velazquez III* "rests on limited public forum doctrine"). In a limited public forum, the Court has held, the government may not "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Content discrimination, however, is permissible in a limited public forum so long as it is " 'reasonable in light of the [forum's] purpose.' " *See id.* at 829-30 (quoting *Cornelius*, 473 U.S. at 806).

**[2]** Because LSC's grant program operates much like a limited public forum, the *Velazquez III* court explained, it is subject to the First Amendment principles that govern such forums. *See* 531 U.S. at 544. Accordingly, the Court held that restrictions on the activities of LSC grantees may not target a particular viewpoint or motivating ideology, and they "cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Id.* at 549.

**[3]** Justice Kennedy's discussion of how the suits-for-benefits exception "distorts the legal system" is thus ancillary to the Court's holding. The reference to distortion is best understood as underscoring the analytical connection linking LSC's grant program to the government properties and programs that the Court has recognized as limited public fora for the purposes of the First Amendment — not as elaborating a novel First Amendment doctrine. *See id.* at 544 (explaining that "[r]estricting LSC attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys *in much the same way* broadcast systems or student publication

networks were changed" in the Court's limited public forum cases (emphasis added)).

**[4]** With this understanding of *Velazquez III* in mind, we return to the Restrictions. In prohibiting grantees from soliciting clients, lobbying, and participating in class actions, Congress did not discriminate against any particular viewpoint or motivating ideology, much less did it aim to suppress "ideas . . . inimical to the Government's own interest." *Id.* at 549. The Restrictions simply limit specific procedural tools and strategies that grantee attorneys may utilize in the course of carrying out their legal advocacy. As such, they are permissible under *Velazquez III*.[8]

**[5]** In sum, we conclude that *Velazquez III* did not establish a new First Amendment test that hinges on whether restrictions on a given government subsidy distort an existing medium of expression. Rather, the Court applied familiar principles, drawn from the limited public forum doctrine, to strike down a viewpoint-based restriction on private expression. Because the Restrictions do not discriminate against a particular viewpoint, they are constitutional under *Velazquez III*. *LASH III* thus remains controlling precedent, and the district court did not err in dismissing Plaintiffs' facial challenge to the Restrictions.[9]

---

[8]Plaintiffs do not contend that the Restrictions are "unreasonable" as the term is used in the Court's limited public forum cases. For that reason, we do not address the issue raised by the dissent that Plaintiffs' distortion arguments should be considered as part of a reasonableness inquiry. Additionally, Plaintiffs do not contend that either the class action, solicitation, or lobbying restrictions discriminate on the basis of viewpoint.

[9]We note that the Second Circuit — the only other circuit to consider the constitutionality of the Restrictions post-*Velazquez III* — reached the same conclusion. *See Velazquez V*, 462 F.3d at 236 (adopting the district court's conclusion in *Velazquez IV* that the in-person solicitation and class action restrictions are reasonable and viewpoint neutral, and therefore permissible under *Velazquez III*).

## II.   As-Applied Challenge

Plaintiffs contend that the PIR, as LSC has interpreted and applied it, effectively prevents them from expressing protected speech through alternative channels. Because they have not "demonstrated as a factual matter that the [PIR] has not left them adequate alternative channels for protected expression," *Velazquez V*, 462 F.3d at 231, the district court properly entered summary judgment in favor of LSC. We first address LASO and its clients' as-applied claims, and then turn to the individual LASO attorneys' claims.**[10]**

### A.   LASO and its Clients

**[6]** In *LASH III* we held that, as a facial matter, the PIR provides LSC grantees (and their employees and clients) with adequate alternative channels for engaging in restricted speech. We acknowledged, however, that a grantee could challenge subsequent applications of the PIR in a separate action. *See LASH III*, 145 F.3d at 1024 (noting that "even if [the *LASH* plaintiffs] presented a factual situation that suggested the restrictions were unconstitutional in only limited circumstances . . . [the court] would not strike down the restrictions as unconstitutional" in the context of a facial challenge).

**[7]** An as-applied First Amendment challenge contends that a given statute or regulation is unconstitutional as it has been applied to a litigant's particular speech activity. *See Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984). The underlying constitutional standard, however, is no different then in a facial challenge. *See*

---

**[10]**Plaintiffs do not explain how LSC's application of the PIR violated the free speech rights of LASO's private donors, nor do they address how OLC, an unrestricted LASO affiliate not subject to the PIR, could suffer an as-applied First Amendment violation. Accordingly, we do not address those claims.

*Velazquez V*, 462 F.3d at 228 ("Facial and as-applied challenges differ in *the extent to* which the invalidity of a statute need be demonstrated . . . [i]nvariant, however, is the *substantive rule of law* to be used."). Accordingly, we apply the constitutional standard set forth in *LASH III*, namely, whether LSC's enforcement of the PIR has effectively cut off alternative channels through which Plaintiffs can express restricted speech. *See LASH III*, 145 F.3d at 1025.

**[8]** Between 1996 and 2005, LASO and OLC coordinated their efforts to deliver legal services to indigent clients, but maintained legal, physical, and financial separation from each other. During that period, LSC did not assert or imply that LASO's affiliation with OLC violated the PIR. LSC's rejection of the Proposal in 2005 — the only concrete application of the PIR in the record before us — is thus the focal point of our analysis.

LSC determines whether a grantee is sufficiently independent from a non-restricted affiliate on a case-by-case basis, taking into consideration the totality of the circumstances. 45 C.F.R. § 1610.8(a)(3). "Mere bookkeeping separation of LSC funds from other funds is not sufficient." *Id.* Other factors, such as having separate personnel, separate accounting and timekeeping records, separate facilities, and distinguishing forms of identification are relevant but not dispositive. *Id.* All grantees must annually certify to LSC that their program complies with the PIR, 45 C.F.R. § 1610.8(b), and a grantee uncertain about whether its relationship with a restricted affiliate satisfies the PIR may "submit [to LSC] all the relevant 'program integrity' information and request a review by [LSC] of any existing or contemplated relationship with an organization that engages in restricted activities," 62 Fed. Reg. 27,695, 27,698.

**[9]** Plaintiffs do not dispute that by eschewing formal legal separation, the Proposal violated the PIR on its face. Although LSC generally applies a case-by-case, totality-of-the-

circumstances approach to PIR enforcement, it informs grantees that they "may transfer *non*-LSC funds to another organization which engages in restricted activity if, and only if, the other organization is a legally separate entity." LSC Instructions for Certification of Program Integrity at 1. We upheld the validity of the PIR's legal separation requirement in *LASH III*, and thus, LSC's rejection of the Proposal on that basis cannot itself establish an as-applied First Amendment violation. 145 F.3d at 1027 ("[W]e do not find it significant that the LSC regulations require that [an] unrestricted [affiliate] organization be a 'legally separate entity.' " (quoting 45 C.F.R. § 1610.8(a)(1))).

Plaintiffs contend that they cannot risk testing the PIR's limits, because doing so could lead to immediate termination of federal funding they depend on for basic operations. Plaintiffs' professed fear is not sufficient to establish an as-applied violation of their First Amendment rights. First, we note that Congress has provided that LSC grant funding "shall not be suspended unless the grantee, contractor, or person or entity receiving financial assistance . . . has been given reasonable notice and opportunity to show cause why such action should not be taken," 42 U.S.C. § 2996j(1), and that grantees are entitled to a pre-deprivation hearing before "an independent hearing examiner," *id.* § 2996j(2). Thus, Plaintiffs' concerns about *immediate* termination of funding without prior notice appear to be unwarranted.

Further, Plaintiffs have not explained why the prospect of funding termination prevents them from submitting an amended configuration proposal (one that, at the very least, conforms to the PIR's legal and physical separation requirements) to LSC. LSC officials testified that they engage in an iterative process with grantees to ensure PIR compliance, and Plaintiffs have offered no evidence suggesting that this characterization of LSC's general approach is inaccurate. While submitting an amended proposal (or proposals) may impose some level of practical burden on LASO and its staff, *LASH*

*III* makes clear that a grantee must show more than a burden on the exercise of protected speech to establish an as-applied First Amendment violation — the grantee must show that workable alternative channels do not exist.

Plaintiffs point to enforcement actions that LSC has taken against other grantees to bolster their as-applied challenge. They contend that a "prudent" grantee will pay close attention to PIR compliance audits and investigative reports that LSC periodically conducts and makes available to the public, and entered several audits and reports of this kind into the record. The district court disregarded the evidence of LSC's application of the PIR to grantees other than LASO, concluding that it was not relevant in the context of an as-applied First Amendment challenge.

We have held that "[a]n as-applied [First Amendment] challenge does not implicate the enforcement of the [challenged] law against third parties." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). That general principle clearly applies here. That a grantee may glean insight into LSC's enforcement policies by examining publically available audits and LSC Inspector General reports is not controversial. Plaintiffs, however, go a step further. They contend that LSC audits of other, unrelated grantees are tantamount to actual enforcement actions against LASO, its staff attorneys, and its clients. Accepting this premise would require the court to assume that LSC would treat LASO in the same manner that it has treated other grantees — despite the myriad practical differences among grantees and LSC's "totality-of-the-circumstances" approach to determining PIR compliance — and then speculate about whether that treatment would violate the First Amendment. Such an approach is inconsistent with the limited scope of an as-applied constitutional challenge.

**[10]** In sum, the record reflects that LSC employs a flexible, fact-intensive process for determining whether a grantee maintains objective integrity and independence. LASO has

not been subjected to an LSC audit, nor, according to the record, has it been threatened with an audit, despite its close affiliation with OLC. LSC's rejection of the Proposal, standing alone, is not sufficient to establish an as-applied First Amendment violation, and Plaintiffs have not identified any other concrete application of the PIR that has had the effect of prohibiting LASO, or the clients the organization serves, from expressing restricted speech through alternative channels.

## B.   LASO Attorneys

The individual LASO attorneys' separately contend that they are entitled to summary judgment on their as-applied challenge to the PIR.

Their argument runs as follows: LSC, in an official guidance document and in audits of other grantees, has stated that if more than ten percent of a larger grantee's attorneys work part-time for a particular unrestricted affiliate, the grantee is likely not in compliance with the PIR. Therefore, at least *some* LASO attorneys that wish to do so (they offer affidavits from individual LASO attorneys suggesting that more than ten percent of LASO's attorneys do in fact wish to work for OLC part-time), are effectively barred from exercising protected speech rights. The district court denied the attorneys' motion for partial summary judgment, concluding that they had failed to show any specific instance where LSC had denied an individual LASO attorney's request to work part-time (or on his or her own time) for an unrestricted organization.[11]

[11] We agree that the individual LASO attorneys have failed to show that LSC's enforcement of the PIR effectively cuts off alternative channels for engaging in protected speech.

---

[11]An attorney working full-time for an LSC grantee may only engage in the outside practice of law under limited circumstances. *See* 45 C.F.R. § 1604.4.

A 1997 LSC Guidance Memorandum states the following:

> There is no *per se* bar against a recipient employing
> part-time staff who are also employed part-time by
> an organization which engages in restricted activity.
> Generally speaking, however, the more staff
> "shared," or the greater the responsibilities of the
> staff who are employed by both organizations, the
> more danger that program integrity will be compro-
> mised. Sharing an executive director, for example,
> inappropriately tends to blur the organizational lines
> between the entities. Likewise, sharing a substantial
> number or proportion of recipient staff calls the
> recipient's separateness into question.

In a footnote, the memo explains that "[f]or larger organiza-
tions, 10% of the recipients's attorney/paralegal staff should
serve as a guide. However, for recipients with smaller staffs,
the program director should use his or her best judgment to
determine whether part-time staff constitute a substantial pro-
portion of the recipient's legal workforce."

The above statements outline LSC's general methodology
for determining whether a grantee and an unrestricted affiliate
are sufficiently separate. The rough "10 percent rule" that the
LASO attorneys rely on does not suggest that only 10 percent
of LASO's staff may engage in restricted activity part-time,
or on their own time, but rather that, under normal circum-
stances, no more than 10 percent of LASO's legal staff may
work part-time *at the same unrestricted organization*. That
the PIR prevents at least some LASO attorneys from working
part-time for OLC does not establish that it effectively cuts
off alternative channels for engaging in protected speech. As
we recognized in *LASH III*, LASO attorneys are free to pursue
a variety of alternative avenues for expressing restricted
speech, including working full-time for an unrestricted orga-
nization, or alternatively, continuing to work for an LSC

grantee organization and engaging in restricted activities on their own time. *See LASH III*, 145 F.3d at 1029.

**[12]** The district court thus did not err in denying the individual LASO attorneys' motion for partial summary judgment.

## III.   Motion for New Trial and Related Discovery Issues

**[13]** Plaintiffs contend that the district court abused its discretion in denying their motion for a new trial and their motions to compel the production of documents relating to LSC's enforcement of the Restrictions. We disagree.

The basic premise underlying both Plaintiffs' motion for a new trial and their motions to compel discovery — that the Restrictions and the PIR can be challenged in separate as-applied claims — is flawed. As we have explained, under *LASH III*, the Restrictions are constitutional so long as LSC's enforcement of the PIR provides grantees with alternative channels through which they can direct restricted speech. *Velazquez III* did not disturb the holding in *LASH III*; thus, the district court properly focused the litigation below on the manner in which LSC has interpreted and applied the PIR.

### CONCLUSION

For the reasons set forth above, the judgment of the district court is

**AFFIRMED.**

PREGERSON, Circuit Judge, amended partial dissent:

In 1974, Congress established the not-for-profit Legal Services Corporation ("LSC") for the purpose of distributing grants to enable qualifying legal service organizations to provide free legal assistance to the poor in non-criminal proceedings. 42 U.S.C. §§ 2996-2996*l*. In the years since, Congress has attached a number of restrictions to the ways in which recipients of LSC grants can provide legal services. *See, e.g.*, § 2996f(b). In 1996, Congress attached another set of restrictions to the LSC grants. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 504, 110 Stat. 1321, 1321-53-56 (1996) (the "1996 Act"), reenacted in the Omnibus Consolidated Rescissions and Appropriations Act of 1997, Pub. L. 104-208, § 502, 110 Stat. 3009 (1997).

In this case, Plaintiffs mounted a facial challenge to three of the 1996 LSC Restrictions. Specifically, Plaintiffs challenged the LSC Restrictions on: (1) "attempt[s] to influence" legislation and/or administrative rule-making processes; (2) initiation of, and participation in, class action lawsuits; and (3) soliciting clients. Plaintiffs argued that these three Restrictions violate their First Amendment rights to free speech and association because the Restrictions distort Plaintiffs' ability to provide legal services to their clients.

The district court rejected Plaintiffs' distortion argument. In so doing, the district court erred. First, determining whether the three Restrictions distort legal services attorneys' ability to effectively represent their clients is key to determining whether the Restrictions are unreasonable in light of the purpose of the LSC grants, and, thus, violate the First Amendment. Second, the three Restrictions *do* distort the legal system by imposing serious and fundamental limits on legal services attorneys' ability to effectively represent their clients such that the Restrictions are unreasonable in light of the purpose of the LSC grants.

## I. Distortion Renders the Restrictions Unreasonable

### A. *Velazquez III*

In *Velazaquez III*, the Supreme Court held that the LSC "suits-for-benefits" restriction, which prohibited legal services attorneys from challenging existing welfare laws, was unconstitutional. *Legal Servs. Corp. v. Velazquez* (*Velazquez III*), 531 U.S. 533, 536 (2001). As the majority in this case observes, in *Velazquez III*, the Supreme Court "did not establish a new First Amendment test," but rather analyzed the suits-for-benefits restriction "through the lens of the Court's limited public forum cases." *See* Majority Opinion at 7970-72. Under the limited public forum analysis, a restriction on speech must be "reasonable in light of the purpose served by the forum" and cannot "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks omitted). Thus, whether a LSC restriction violates the First Amendment depends on whether the restriction is (1) reasonable in light of the purpose of the LSC grants (to provide free legal services to the poor), and (2) viewpoint neutral.

Applying the limited public forum analysis, the *Velazquez III* Court held that the suits-for-benefits restriction was unconstitutional. *Id.* at 548. The reasons identified by the Court for reaching this conclusion included the Court's determinations that (1) the suits-for-benefits restriction "distorts the legal system by altering the traditional role of the attorneys . . . . ," and that (2) Congress may not subsidize legal services in a way that seriously and fundamentally restricts the advocacy of attorneys. *Id.* at 544.

The majority contends that *Velazquez III* was decided on viewpoint discrimination grounds. *See* Majority Opinion at 7971-72. This reading of *Velazquez III* is mistaken. Instead, *Velazquez III* struck down the suits-for-benefits restriction on

reasonableness grounds. That *Velazquez III* was decided on reasonableness grounds is illustrated by two aspects of the opinion. First, the *Velazquez III* majority repeatedly discussed the suits-for-benefits restriction in the context of the purpose of the LSC grants.[1] This is significant because analysis of the LSC grants' purpose goes to whether a restriction is reasonable, not to whether it discriminates on the basis of viewpoint. Second, the *Velazquez III* majority never stated that it was deciding the case on viewpoint discrimination grounds and did not dispute the dissent's contention that the majority did not challenge whether the suits-for-benefits restriction was viewpoint neutral. *See Velazquez III*, 531 U.S. at 549 (Scalia, J. dissenting) (noting that the majority did not claim the suits-for-benefits restriction "discriminates on the basis of viewpoint."). This is significant because if the *Velazquez III* majority intended to overturn the suits-for-benefits restriction on viewpoint grounds, one would expect the majority to respond to the dissent's assertion to the contrary.

Thus, the *Velazquez III* majority's discussion of how the suits-for-benefits restriction "distorts the legal system" can properly be understood to refer to the "reasonableness" of the restriction in light of the purpose of the LSC grants rather than whether the restriction was viewpoint neutral. Because the suits-for-benefits restriction "distort[ed] the legal system by altering the traditional role of . . . attorneys," it was unreasonable in light of the purpose of the LSC grants. And, because the suits-for-benefits restriction was unreasonable in

---

[1]*See, e.g.,* 531 U.S. at 536 (noting the purpose of LSC grants is to fund legal representation for the indigent in noncriminal matters); *Id.* at 537 (explaining that the restriction permitted the attorney-grantees to represent "indigent clients seeking welfare benefits" but, prohibited the attorney-grantees from challenging "existing welfare law"); *Id.* at 543 (noting that review of the restriction is informed by whether the restriction is necessary to the program's purpose); *Id.* at 544 (noting that the government seeks to facilitate suits-for-benefits but distorts the judiciary's ability to resolve the claims).

light of the purpose of the LSC grants, it violated the First Amendment under the limited public forum analysis.

### B. Plaintiffs' Distortion Arguments Were Not Properly Considered

Before the district court, Plaintiffs argued that the three Restrictions violate the First Amendment because they distort legal services attorneys' ability to effectively represent their clients. Plaintiffs, however, did not frame their distortion arguments as reasonableness arguments within the limited public forum analysis. Nonetheless, whether the three Restrictions distort legal services attorneys' ability to effectively represent their clients is key to determining whether the Restrictions are unreasonable within the limited public forum analysis. For this reason, the district court should have considered Plaintiffs' distortion arguments as part of the reasonableness inquiry.[2]

---

[2]The majority concludes that "Plaintiffs do not contend that the Restrictions are 'unreasonable' as the term is used in the Court's limited public forum cases." *See* Majority Opinion at 7972 n. 8. For that reason, the majority does not address Plaintiffs' distortion arguments as part of the reasonableness inquiry. *See Id.* I believe that Plaintiffs have sufficiently presented this issue for consideration. Plaintiffs argue that under *Velazquez III*, the three Restrictions violate the First Amendment because they distort legal services attorneys' ability to effectively represent their clients. *See* Plaintiffs' Complaint Para. 79-87 (Docket # 1); Plaintiffs' Opposition to Defendant LSC's Motions to Dismiss at 1, 30-35 (Docket # 38); Plaintiffs' Opening Brief at 48-53. Thus, Plaintiffs raise the correct constitutional claim, the controlling case, and the critical argument. That the Plaintiffs do not more precisely frame that argument as part of the reasonable inquiry does not prevent this court from so considering it now. *Cf. Elder v. Holloway*, 510 U.S. 510, 513-516 (1994) (holding that rather than considering only the authority relied on by the district court, which "could occasion appellate affirmation of incorrect legal results," an appellate court reviewing a qualified immunity judgment should "use its full knowledge of its own and other relevant precedents") (internal quotation marks omitted); *Agyeman v. INS*, 296 F.3d 871, 877-78 (9th Cir. 2002) (holding that a petitioner sufficiently raised a due process claim in his appeal to the Board of Immigration Appeals even though he did not use the phrase "due process violation").

The district court, however, did not address the question whether the three Restrictions distort the process of legal representation such that the Restrictions are unreasonable in light of the purpose of the LSC grants. Because of this failure, the district court incorrectly analyzed whether the three Restrictions violate the First Amendment.

## II.  The Restrictions Distort Legal Service Attorneys' Ability to Effectively Represent their Clients

The district court's failure to properly consider whether the three Restrictions distort legal services attorneys' ability to effectively represent their clients was a critical error because the Restrictions *do* distort legal services attorneys' ability to effectively represent their clients such that the Restrictions are unreasonable in light of the purpose of the LSC grants.

To effectively represent their clients, attorneys may need to use any number of legal tools. Some of the tools an attorney may use include: making a phone call, writing a letter, trying to negotiate a settlement, seeking alternative dispute resolution, filing a lawsuit seeking an injunction, filing a lawsuit seeking damages, filing a lawsuit challenging the validity of the underlying law, or seeking to change the underlying law through lobbying. For example, where a client's claim has a particularly small monetary value, an attorney might seek to combine that client's claim with similar claims of others through joinder or through a class action.

Landlord-tenant disputes further illustrate how attorneys might need to use a variety of legal tools to effectively represent a poor client. Landlord-tenant disputes often involve very small sums of money, but carry huge quality of life implications. A poor tenant, for example, who fails to get her landlord to eliminate a lead paint hazard in an apartment might face the untenable choice of risking harm to the health of her children by staying or upending her family's lives and incurring substantial costs by moving out. Where such a tenant

seeks legal help, she could have a winning legal claim that is nonetheless not a viable solution to her lead paint problem because the potential damage award is too small to motivate the landlord to fix the problem. By combining that tenant's claim with other tenants' similar claims, however, an attorney could increase the potential cost of losing to an amount large enough to motivate the recalcitrant landlord to remove the lead paint hazard. But under the Solicitation Restriction at issue in this case, legal services attorneys are prohibited from seeking other clients with the same problem. Consequently, in this hypothetical, were a legal services attorney to take on the original tenant's case, that attorney would not be in a position to effectively represent his client.

Similarly, a client may have a wage and hour claim of such a small monetary value that even if she were to prevail, a large and obstinate employer would not be persuaded to change the underlying practice—thus subjecting the client to a high probability of future harm. In such a case, a class action might be the only way to root out the underlying practice. Alternatively, a client might be suffering an injury that falls just outside existing wage and hour law. In such a case, lobbying to change the underlying wage and hour law might be the client's only hope of redress. Under the Restrictions, however, a legal services attorney cannot pursue a class action or assist a client in lobbying to change an existing law. Consequently, in both these wage and hour hypotheticals, a legal services attorney would not be able to employ the legal tools necessary to most effectively represent his client.

This same analysis applies to many of the real life problems facing the poor. By depriving legal services attorneys of their ability to pursue class actions, solicit other clients with similar problems, or lobby to change a law, the three Restrictions at issue often prevent legal services attorneys from employing the legal tools that would most effectively redress a client's problems. The Restrictions thus distort the legal system because they seriously and fundamentally limit legal services

attorneys' ability to effectively represent their clients by curtailing the legal tools that legal services attorneys can employ to advocate on their clients' behalf.

## III.   Conclusion

It is tough for the poor to find good lawyers. The purpose of LSC grants is to help ameliorate that social problem by providing funds for legal assistance to people who cannot otherwise pay for a lawyer. Even so, there is still a scarcity of lawyers serving the poor. Upholding these three Restrictions severely constrains those dedicated lawyers who choose to serve the poor by seriously and fundamentally limiting their ability to effectively represent their clients. The three Restrictions thus distort a legal system designed to "do equal right to the poor and to the rich" (28 U.S.C. § 453, Oaths of justices and judges) so that all Americans will be the beneficiaries of a system of government based on equal justice under the law. Under the limited public forum analysis, because these three Restrictions distort legal services attorneys ability to effectively represent their clients, they are thus unreasonable in light of the purpose of the LSC grants and therefore violate the First Amendment. For this reason, I would reverse the district court as to Plaintiffs' facial challenge to the three Restrictions.